**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JOHN OSBORNE, BRIAN COLEMAN EVE COLEMAN, HELEN MILLHOUSE, and MATTHEW D. BROWN, as participants in and on behalf of the Kraft Heinz Savings Plan, and on behalf of all others similarly situated, | Case No. 2:19-cv-00307-MRH |
| Plaintiffs, | **FIRST AMENDED CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| EMPLOYEE BENEFITS ADMINISTRATION BOARD OF KRAFT HEINZ, BERNARDO HEES, PAULO BASILIO, DAVID KNOPF, ANDREW STONER, RISHI NATARAJAN, YANG XU, JAMES LIU, GREG GUIDOTTI, CHRISTOPHER SKINGER, and VINCE GARLATI, , | |
| Defendants. | |

**FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE**
**EMPLOYEE RETIREMENT INCOME SECURITY ACT**

Plaintiffs John Osborne, Brian Coleman, Eve Coleman, Helen Millhouse and Matthew D.

Brown ("Plaintiffs"), by and through their attorneys, file this Complaint as participants in and on

behalf of the Kraft Heinz Savings Plan (the "Plan"), and as a class action under Fed. R. Civ. P. 23

on behalf of themselves and other similarly situated current and former employees of Kraft Heinz

Food Company ("Kraft Heinz" or the "Company") who were participants in and beneficiaries of

various defined contribution retirement plans sponsored by Kraft Heinz who invested their

retirement savings in Kraft Heinz stock through the Plan during the period of May 4, 2017, through

February 21, 2019, inclusive (the "Class Period"). Plaintiffs allege the following based on personal

knowledge with respect to their own circumstances and based on information and belief pursuant

to the investigation of their counsel, which included a review of certain of the Plan's governing

documents; the Plan's annual reports filed with the United States Securities and Exchange Commission ("SEC") and U.S. Department of Labor ("DOL"); discussions with Plan participants; other SEC filings by Kraft Heinz; other lawsuits against Kraft Heinz; press releases and other public statements issued by Kraft Heinz; and media reports and analyses regarding Kraft Heinz. Plaintiffs believe that substantial additional evidentiary support exists and will emerge for the allegations set forth herein after there has been a reasonable opportunity for discovery.

## INTRODUCTION

1.      This is a class action brought pursuant to Section 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132, against the Employee Benefits Administration Board of Kraft Heinz (the "EBAB"); certain officers and employees of Kraft Heinz who are members of the EBAB; and the Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO") of Kraft Heinz, who were responsible for appointing, monitoring and removing members of the EBAB (collectively "Defendants").

2.      This action is brought by participants in the Plan, and on behalf of the Plan, to recover many millions of dollars of damage suffered in their retirement accounts.  On February 21, 2019, after the stock market closed, Kraft Heinz announced its earnings for the fourth quarter of 2018.  To the shock of investors, including Plan participants, Kraft Heinz disclosed that the Company took an impairment charge of $15.4 billion to lower the carrying amount of goodwill in its U.S. Refrigerated and Canada retail reporting units and the carrying amount of certain intangible assets, including the Company's Kraft and Oscar Mayer trademarks.  The impairment charge resulted in a net loss attributable to common shareholders of $12.6 billion and diluted loss per share of $10.34.

3. The Company further publicly disclosed for the first time on February 21, 2019 that Kraft Heinz had received a subpoena from the SEC in October 2018 in relation to the Company's procurement function. As a result of the SEC investigation, the Company conducted its own internal investigation, which resulted in the Company recording a $25 million increase to costs of products sold, damaging the Company's credibility and provoking fears of future accounting adjustments.

4. On the same day, the Company announced a quarterly dividend of $0.40 per share, which represented a 36% reduction from the $0.625 quarterly dividend Kraft Heinz had been paying. The decrease was designed to save the company $1 billion a year to help reduce long-term debt of $30.9 billion

5. As a result of these disclosures, the price of Kraft Heinz common stock declined over 27% from $48.18 per share to $34.95 per share, erasing more than $16 billion of the Company's market capitalization. Plan participants were damaged not just by this loss in value, but by the purchases they made at inflated prices during the time when Kraft Heinz's stock price was not trading at its true value.

6. This sudden and massive write down of the Company's goodwill could have been avoided. Defendants knew, or should have known, that the Company was lugging around a large amount of impaired goodwill and intangible assets since the merger of the H. J. Heinz Company and Kraft Foods, Inc. in 2015. For example, as of December 2017, the Company showed $44.8 billion in goodwill on its balance sheet, which was 37% of the Company's total assets. Goodwill and intangible assets together represented a whopping 87% of the Company's assets. As early as May 2017, analysts were questioning the amount of goodwill and intangible assets the Company was carrying, yet no one at Kraft Heinz publicly recognized the true scope of the goodwill and

intangible asset impairment until February 2019, when the disclosure of the write-down severely damaged the Plan participants' retirement accounts.

7.     Defendants, as fiduciaries of the Plan, owed "the highest duty known to the law" to Plan participants, which included a statutorily mandated duty to monitor and ensure the prudence of the Plan's investments and to communicate truthfully with those to whom their duties were owed.  Indeed, among the most important duties of the Plan fiduciaries was ensuring that each Plan investment option remained prudent—including investments in the Company's own stock. Each Plan fiduciary had a continuing duty to monitor employee retirement funds in Kraft Heinz stock and to ensure that this investment remained a prudent option based on what each fiduciary knew (or should have known) at the time.

8.     Defendants breached those duties throughout the Class Period by imprudently investing in Kraft Heinz stock despite knowing (or being negligent in not knowing) that the value of Kraft Heinz's stock was artificially inflated due to, *inter alia*,

- the undisclosed impairment of the Company's goodwill and intangible assets including its Kraft and Oscar Mayer brands and the Company's U.S. Refrigerated and Canadian retail businesses;

- undisclosed and improper accounting policies and procedures relating to the Company's procurement activities including, without limitation, agreements, side agreements, and changes or modifications to its agreements with its vendors (which opened the Company up to an SEC investigation); and

- material misstatements regarding the Company's operating results and materially false and misleading disclosures in the Company's SEC filings.

9.     Moreover, Defendants are senior executives of the Company who possessed inside information and knowledge not available to Plan participants and were—or should have been— familiar with the rudimentary principles of how securities trade in efficient markets.

10.     Notwithstanding Defendants' powerful, insider position, they failed to protect the Plan and the Plan participants from foreseeable harm by allowing Plan participants to purchase

4

and hold an imprudent investment in Kraft Heinz stock that was disqualified under ERISA as well as damaging to the Plan.

11.     Defendants were duty-bound to try to prevent, or at least mitigate, any damage caused to the Plan and its participants by the material misrepresentations, accounting errors, and impaired goodwill described herein.  For example, through timely corrective public disclosures designed to remedy the Company's inflated stock price, Defendants could have mitigated the harm to Plan participants by making Kraft Heinz stock an accurately priced, prudent investment again.

12.     No fiduciary in the Defendants' position could have believed that taking corrective actions to disclose accounting misstatements and to remedy Kraft Heinz's impaired goodwill would do "more harm than good" to the Plan or to Plan participants.

13.     Kraft Heinz stock traded in an efficient market. Kraft Heinz is traded on the NASDAQ exchange and is a component of the S&P500 and S&P100 indices. Since January 1, 2007, an average of 5.7 million shares of Kraft Heinz are bought and sold each trading day.

14.     Defendants should have known that correcting the Company's misrepresentations, accounting errors, and impaired goodwill would reduce Kraft Heinz's stock price only by the amount by which it was artificially inflated to begin with.  They had no basis to believe that any factor was distorting the market for Kraft Heinz stock at the time—such as widespread short-selling or liquidity problems or the like—and thus no reason to fear that corrective actions would reduce Kraft Heinz's stock price to anything but its true, accurate value.  Moreover, Defendants should have known that further delays in disclosing the Company's accounting errors, misrepresentations and impaired goodwill would only increase the harm suffered by Kraft Heinz stockholders, including the Plaintiffs and Plan participants.

15.     As soon as the Defendants learned that Kraft Heinz's stock price was artificially inflated, they should have caused the Company to make corrective disclosures in order to mitigate the reputational damage the Company would suffer and soften the impact of the price correction. And in the long term, the Company's reputational trustworthiness would have been less undermined as well, making a swifter price recovery, and greater future gains, more likely. Defendants knew, or should have known, that disclosure of the Company's misstatements, accounting errors, and impaired goodwill was going to happen sooner or later—better for Defendants to get out ahead of the disclosure rather than prolonging the period of artificial inflation during which Plan participants would continue to be damaged by purchasing Kraft Heinz stock at inflated prices.

16.     These false and misleading statements, and Kraft Heinz's failure to disclose critical, material information to the public, caused the market to improperly value Kraft Heinz's stock price. As a result, Defendants, who knew or should have known that false and misleading statements were continuously made, also knew or should have known that the Company's misrepresentations had artificially inflated the price of Kraft Heinz stock throughout the Class Period. When the Company finally made brought the truth to light in February 2019, its stock price plummeted to its true value, dropping over 27%, from $48.18 per share to $34.95 per share, erasing more than $16 billion of the Company's market capitalization.

17.     In short, the Plan participants who purchased Kraft Heinz stock paid excessive prices for it during the Class Period. They suffered concrete financial harm to their retirement savings by over-paying for Kraft Heinz stock which, Defendants knew, or should have known, would fall sharply in value when the Company disclosed its impaired goodwill and misrepresentations. The Plan participants who purchased Kraft Heinz stock were damaged by

overpaying this amount, and they bore this foreseeable loss which could have been avoided. No matter what happens to the stock price in the future, these Plan participants sustained a loss due to paying the excessive artificial price, and they will bear this loss even if Kraft Heinz stock recovers in the future. Defendants should have acted to end and prevent this concrete, present harm to the Plan and its participants. Plan participants who simply held Kraft Heinz were damaged as well, particularly because Kraft Heinz's delay in correcting the market's misapprehension of the Company's true value materially increased the likelihood of a slower-than-necessary recovery for Kraft Heinz's stock price, thus increasing the duration of Plan participant holders' losses and unfairly penalizing those participants who may wish to withdraw some or all of their holdings because Kraft Heinz stock has had time to fully recover.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

19.     Venue is proper in this district pursuant to ERISA § 501 (e)(2), 29 U.S.C. § 1132(e)(2), because the Plan was administered in this district, some or all of the fiduciary breaches for which relief is sought occurred in this district, and Kraft Heinz maintains its primary place of business in this district.

20.     Specifically, this district is an appropriate venue for this action because the Plan identifies its address as being in this district on the Forms 5500 filed annually with the Internal Revenue Service: **One PPG Place, Suite 3400, Pittsburgh, PA 15222**. Additionally, it is likely that many of the parties and potential witnesses are located in, or are within close proximity to, this district; because the Plan is administered at the above address, discovery relating to the monitoring and administration of the Plan is likely to be found at or near that address.

**PARTIES**

21.      Plaintiff John Osborne is a Plan participant within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7).  He was an employee of Kraft Heinz and a participant in the Plan.  He purchased and held shares of Kraft Heinz stock in his Plan retirement savings account during the Class Period.

22.      Plaintiff Brian Coleman is a Plan participant within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7).  He is an employee of Kraft Heinz and a participant in the Plan.  He purchased and held shares of Kraft Heinz stock in his Plan retirement savings account during the Class Period.

23.      Plaintiff Eve Coleman is a Plan participant within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7).  She is an employee of Kraft Heinz and a participant in the Plan.  She purchased and held shares of Kraft Heinz stock in her Plan retirement savings account during the Class Period.

24.      Plaintiff Helen Millhouse is a Plan participant within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7).  She is an employee of Kraft Heinz and a participant in the Plan.  She purchased and held shares of Kraft Heinz stock in her Plan retirement savings account during the Class Period.

25.      Plaintiff Matthew D. Brown is a Plan participant within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7).  He is an employee of Kraft Heinz and a participant in the Plan.  He purchased and held shares of Kraft Heinz stock in his Plan retirement savings account during the Class Period.

26.      Defendant EBAB is a committee established by the governing documents of the Plan and is a "named fiduciary" of the Plan according to those documents.  The EBAB is a Plan fiduciary pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), by virtue of having discretionary authority and control regarding the management of the Plan and/or the Plan's assets.

8

27.     Defendant Bernardo Hees is the CEO of Kraft Heinz.  As CEO, Hees has fiduciary responsibility for appointing, monitoring and removing members of the EBAB.

28.     Defendant Paulo Basilio was CFO of Kraft Heinz until October 2017 and has since become Head of U.S. Zone.   As CFO, Basilio had fiduciary responsibility for appointing, monitoring and removing members of the EBAB.

29.     Defendant David Knopf has been the CFO at Kraft Heinz since October 2017.  Prior to his appointment as CFO, Knopf served as Vice President of Finance at Kraft Heinz since 2015. Prior to 2015, Defendant Knopf held various roles at 3G Capital (the owner of a substantial interest in Kraft Heinz) from 2013 to 2015.  As CFO, Knopf had fiduciary responsibility for appointing, monitoring and removing members of the EBAB.

30.     Defendant Andrew Stoner has been Head of North American Business Services since August 2018 and a member of the EBAB since September 2015; he is a Plan fiduciary pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), by virtue of having discretionary authority and control regarding the management of the Plan and/or the Plan's assets.

31.     Defendant Rishi Natarajan was the Treasurer of Kraft Heinz until he departed the Company in April 2018.  Prior to his departure, he had also served as a member of the EBAB during the Class Period, and therefore was a Plan fiduciary pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), by virtue of having discretionary authority and control regarding the management of the Plan and/or the Plan's assets.

32.     Defendant Yang Xu has been the Treasurer of Kraft Heinz since April 2018 and has also served since that time as a member of the EBAB, and is therefore a Plan fiduciary pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), by virtue of having discretionary authority and control regarding the management of the Plan and/or the Plan's assets.

33.     Defendant James Liu was a Vice President of Strategic Growth at Kraft Heinz from November 2017 through March 2018, and prior to that was Vice President of Marketing for US Sauces and Condiments from July 2016 through November 2017.  From June 2014 through July 2016, Liu was a Vice President of Global Finance at Kraft Heinz with responsibilities in Treasury, Mergers and Acquisitions, and Strategic Planning.  Until April 2018, he served as a member of the EBAB and so was a Plan fiduciary pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), by virtue of having discretionary authority and control regarding the management of the Plan and/or the Plan's assets.  In April 2018, he departed Kraft Heinz.Defendant Greg Guidotti was previously the Head of Marketing for Oscar Mayer at Kraft Heinz.  Upon information and belief, before his recent departure from Kraft Heinz, he was a member of EBAB during the Class Period and therefore a Plan fiduciary pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), by virtue of having discretionary authority and control regarding the management of the Plan and/or the Plan's assets.

34.     Defendant Christopher Skinger was the Principal Accounting Officer at Kraft Heinz until he left the Company in June 2018.  He was also a member of the EBAB and therefore was a Plan fiduciary pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), by virtue of having discretionary authority and control regarding the management of the Plan and/or the Plan's assets.

35.     Defendant Vince Garlati has been the Principal Accounting Officer at Kraft Heinz since June 2018 and has also been a member of the EBAB since that time; accordingly, he is a Plan fiduciary pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), by virtue of having discretionary authority and control regarding the management of the Plan and/or the Plan's assets.

## THE FIDUCIARY BREACHES

### A. The Plan

36.     The Plan is a defined contribution retirement plan covered by ERISA covering eligible hourly and salaried employees actively employed by the Company. The Plan contains an employee stock option ("ESOP") which permits participants to invest in Kraft Heinz common stock. Kraft Heinz also sponsors other defined contribution retirements plans that are also covered by ERISA and that also included a Kraft Heinz common stock investment option, including, without limitation, the Kraft Heinz Union Savings Plan; the Kraft Foods Group, Inc. TIP Plan; and the Kraft Foods Group, Inc. Thrift Plan.

37.     The Plan and the other defined contribution retirement plans sponsored by Kraft Heinz are co-invested in a commingled investment fund known as the Kraft Heinz Defined Contribution Master Trust (the "Master Trust") for which Fidelity Management Trust Company has served as the trustee since July 1, 2016.  The funding of the Plan is made through employee and Company contributions.

38.     Pursuant to the Plan, the EBAB "is responsible for selecting the investment options in which participants elect to invest their Plan accounts, appointing investment managers to manage one or more of the investment options and monitoring the performance of the investment options."  In addition, the EBAB is responsible for the day-to-day administration and investment operations of the Plan as well as the non-investment operations of the Plan.

39.     According to the Charter of the EBAB,  "[t]he primary function of the [EBAB] is to fulfull the fiduciary role of Plan Administrator for the U.S. employee benefit plans, as that term is defined by [ERISA] and provide oversight for the global benefit plans."  The Charter goes on to state that the "EBAB has full discretionary authority for administering the plans and overseeing the investment performance of the plans."

11

40.     Despite its ability to delegate its powers under the Plan, the EBAB is still a fiduciary subject to ERISA, which forbids fiduciaries from offloading their duties onto others entirely.  Thus, when the members of the EBAB became aware of the artificial inflation of Kraft Heinz's stock price, and the concomitant harm to Plan participants that this inflation would cause, they were still obligated under ERISA to use what powers they had under the Plan to protect those participants from harm.

41.     The CEO and CFO of Kraft Heinz are responsible under the Plan for appointing and removing members of the EBAB.  The EBAB Charter states that it "shall consist of at least six members who shall be appointed by the CEO and CFO, acting jointly.  The appointment shall be for a fixed term at the discretion of the CEO and CFO, acting jointly, or until such member's replacement is appointed and shall qualify."

42.     Among the obligations of the EBAB is to "[m]ake periodic reports to the CEO and CFRO and/or the Board of Directors of the Company … for the purpose of fully informing the CEO and CFO and Board of the status and operations of the plans[.]"  The EBAB is also responsible for "maintain[ing] plan documents and recommend[ing] amendments to employee benefit plans, for approval by the CEO and CFO, acting jointly[.]"

43.     As senior corporate officers, Defendants who were members of the EBAB should have tried to cause to be disclosed, through the appropriate personnel, truthful or corrective disclosures to the public regarding, among other things, the true financial state of the Company and the Company's impaired goodwill and intangible assets.  These truthful or corrective disclosures, made in a timely fashion, would have addressed the artificial inflation of Kraft Heinz stock, Defendants' fiduciary obligation to tell the truth to Plan participants, and would have cured the artificial inflation by making Kraft Heinz stock a prudent investment again.

12

44.    As it happens, the fiduciaries responsible for monitoring the performance of the EBAB fiduciaries were the CEO and CFO of Kraft Heinz, who were also the two executives with primary responsibility for Kraft Heinz's financial disclosures under the federal securities laws. Thus, the EBAB Defendants could have—and should have—entreated their fiduciary monitors, the CEO and CFO of Kraft Heinz, to effectuate corrective disclosure regarding the Company's true financial state and impaired assets through those very securities-law disclosures.

**B.    The Merger**

45.    The Company is the result of the 2015 merger of the H. J. Heinz Company ("Heinz") and Kraft Foods, Inc. ("Kraft").

46.    Heinz, founded in 1869, is an American food processing company based in Pittsburgh, Pennsylvania.  Heinz manufactures thousands of food products in plants on six continents, and it markets these products in more than 200 countries and territories, including such well-known brands as Heinz Ketchup and Ore-Ida potato products.  The company claims to own 150 number-one or number-two brand names worldwide.  In February 2013, Berkshire Hathaway and the Brazilian-American investment firm 3G Capital purchased Heinz for $23 billion.

47.    Founded in 1909 as a door-to-door wholesale cheese business, Kraft Foods Inc. ("Kraft") grew into an American multinational confectionery, food and beverage conglomerate.  It has marketed many brands in more than 170 countries, twelve of which earn more than $1 billion worldwide annually, including Cadbury, Jacobs, Kraft, LU, Maxwell House, Milka, Nabisco, Oreo, Oscar Mayer, Philadelphia, Trident, and Tang.  Kraft also owns such enduring brands as Kool-Aid, Jell-O, and Planters.

48.    On March 25, 2015, Kraft announced a $36 billion merger with Heinz, arranged by Berkshire Hathaway and 3G Capital. The companies heralded the "significant synergy

13

opportunities" that would result from "combining Kraft's brands with Heinz's international platform" while promising to be "fully committed to maintaining an investment grade rating." The resulting company was expected to have a market value of over $80 billion.

49.     At the time the announcement of the merger, Warren Buffett, Chairman and CEO of Berkshire Hathaway said, "I am delighted to play a part in bringing these two winning companies and their iconic brands together. This is my kind of transaction, uniting two world-class organizations and delivering shareholder value.  I'm excited by the opportunities for what this new combined organization will achieve."

50.     The companies completed the merger of Heinz and Kraft on July 2, 2015, forming the Kraft Heinz Company, which is now the fifth largest food and beverage company in the world and the third largest in North America "with an unparalleled portfolio of iconic brands." The new company employs nearly 39,000 employees in over 40 countries.

51.     The press release announcing the completion of the merger touted the "the complementary nature of the two brand portfolios" and the "substantial opportunity for synergies." The press release describes the merger as an "historic transaction unit[ing] two powerful businesses and iconic brands, and provid[ing] a platform for leadership in the food industry both domestically and internationally."

52.     After the merger, Kraft Heinz was led by a group of executives that were, or had been, partners or former employees of 3G Capital, including Defendant Knopf, as well as Bernardo Hees, who had been a partner of 3G Capital since July 2010 and became Chief Executive Officer ("CEO") of Kraft Heinz upon the closing of the merger, and Paulo Basilio, a partner of 3G Capital since 2012 who became EVP and CFO of Kraft Heinz and then US Zone President in 2017.

**C. Kraft Heinz's False Disclosures and Financial Reports**

53.     On May 4, 2017, Kraft Heinz filed a Form 10-Q for the quarter ended April 1, 2017 (the "1Q 2017 10-Q) with the SEC, which provided the Company's first quarter 2017 financial results and position.  The 1Q 2017 10-Q contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by CEO Hees and U.S. Zone President Basilio attesting to the accuracy of the financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

54.     The 1Q 2017 10-Q stated that Kraft Heinz had adequate internal controls and complied with SEC regulations, stating in pertinent part:

**Evaluation of Disclosure Controls and Procedures**

Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures as of the end of the period covered by this report. **Based on that evaluation, the Chief Executive Officers and Chief Financial Officer concluded that our disclosure controls and procedures as of the period covered by this report, were effective and provided reasonable assurance that the information required to be disclosed by us in reports filed or submitted under the Exchange Act is (i) recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms, and (ii) accumulated and communicated to our management, including the Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure.**

**Changes in Internal Control over Financial Reporting**

Our Chief Executive Officer and Chief Financial Officer, with other members of management, evaluated the changes in our internal control over financial reporting during the three months ended April 1, 2017. **We determined that there were no changes in our internal control over financial reporting during the three months ended April 1, 2017 that have materially affected, or are reasonably likely to materially affect our internal control over financial reporting.**

(Emphasis added.)

55.     The Company filed a substantially similar 10-Q on August 4, 2017, for the quarter ended July 1, 2017 (the "2Q 2017 10-Q") with the SEC, which provided the Company's second quarter 2017 financial results and position.   The 2Q 2017 10-Q contained signed SOX certifications by Hees and Basilio attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and also stated that the Company had adequate internal controls and complied with SEC regulations during the second quarter of 2017.

56.     On November 7, 2017, the Company filed a Form 10-Q for the quarter ended September 30, 2017 (the "3Q 2017 10-Q") with the SEC, which provided the Company's third quarter 2017 financial results and position.   The 3Q 2017 10-Q contained signed SOX certifications by Defendants Hees and Basilio attesting to the accuracy of financial reporting and the disclosure of any material changes to the Company's internal controls over financial reporting.

57.     The 3Q 2017 10-Q stated that the Company's internal controls were **not effective** as of September 30, 2017 because of a misapplication of Accounting Standards Update 2016-15, an accounting standard which relates to Statement of Cash Flows, but failed to note any issues with its procurement area or its inflated goodwill and intangible assets stating, in pertinent part:

**Evaluation of Disclosure Controls and Procedures**

Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures as of the end of the period covered by this report to determine if our disclosure controls and procedures as of the period covered by this report, were effective and provided reasonable assurance that the information required to be disclosed by us in reports filed or submitted under the Securities Exchange Act of 1934 is (i) recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms, and (ii) accumulated and communicated to our management, including the Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure. Based on this evaluation, we concluded that our disclosure controls and procedures

were **not effective as of September 30, 2017 due to the material weakness in internal control over financial reporting related to the misapplication of ASU 2016-15, as described below**.

**Material Weakness in Internal Control over Financial Reporting**

A material weakness is a deficiency, or combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected on a timely basis. We did not maintain effective controls over the adoption of new accounting standards. Specifically, we did not maintain effective controls to evaluate and document the impact of new accounting standards, including communication with the appropriate individuals in coming to our conclusions on the application of new standards.

**This control deficiency resulted in the misstatement of our operating and investing cash flows and related financial disclosures, and in the restatement of our consolidated financial statements for the quarters ended April 1, 2017 and July 1, 2017, including the comparable prior periods**. Additionally, this control deficiency could result in a misstatement of the aforementioned account balances or disclosures that would result in a material misstatement to the annual or interim consolidated financial statements that would not be prevented or detected. Accordingly, our management has determined that this control deficiency constitutes a material weakness.

**Remediation of Material Weakness**

The remediation of this material weakness will primarily include steps to improve the evaluation and documentation of new accounting standards' impacts and communication with the appropriate individuals. We plan to have these remediation steps in place during our 2017 fiscal year but will allow for testing to determine operating effectiveness before concluding on remediation.

**Changes in Internal Control over Financial Reporting**

Our Chief Executive Officer and Chief Financial Officer, with other members of management, evaluated the changes in our internal control over financial reporting during the three months ended September 30, 2017**. We determined that there were no changes in our internal control over financial reporting during the three months ended September 30, 2017 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.**

(Emphasis added.)

58.     On February 2, 2018, the Company filed a Form 10-K for the year ended December 30, 2017 (the "2017 10-K") with the SEC, which provided the Company's 2017 financial results and position. The 2017 10-K contained signed SOX certifications by Hees and Defendant Knopf attesting to the accuracy of financial reporting and the disclosure of any material changes to the Company's internal controls over financial reporting.

59.     The 2017 10-K stated that the Company had adequate internal controls and complied with SEC regulations, stating in pertinent part:

**Evaluation of Disclosure Controls and Procedures**

Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures as of the end of the period covered by this report. **Based on that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures as of the period covered by this report, were effective and provided reasonable assurance that the information required to be disclosed by us in reports filed or submitted under the Exchange Act is (i) recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms, and (ii) accumulated and communicated to our management, including the Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure.**

**Remediation of Previously Disclosed Material Weakness**

A material weakness is a deficiency, or combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected on a timely basis. As previously disclosed concurrently with the filing of our Quarterly Report on Form 10-Q for the quarter ended September 30, 2017, we concluded that we had a material weakness in internal control over financial reporting related to the misapplication of Accounting Standards Update 2016-15. Specifically, we did not maintain effective controls over the adoption of new accounting standards, including communication with the appropriate individuals in coming to our conclusions on the application of new standards. Our management determined that the control

deficiency constituted a material weakness. During the fourth quarter of 2017, management implemented steps to improve the evaluation and documentation of new accounting standards' impacts and communication with the appropriate individuals.

**Changes in Internal Control over Financial Reporting**

Our Chief Executive Officer and Chief Financial Officer, with other members of management, evaluated the changes in our internal control over financial reporting during the three months ended December 30, 2017. During the three months ended December 30, 2017, management implemented steps to improve the evaluation and documentation of new accounting standards' impacts and communication with the appropriate individuals. These changes have been designed to ensure enhanced subject matter expert input in relation to new accounting standard pronouncements. **We determined that, except for the remediation activities described above, there were no changes in our internal control over financial reporting during the three months ended December 30, 2017 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.**

**Management's Report on Internal Control over Financial Reporting**

Management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rule 13a-15(f) under the Exchange Act. Our internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external reporting purposes in accordance with generally accepted accounting principles. Our internal control over financial reporting includes those written policies and procedures that:

• pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of assets;

• provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles;

• provide reasonable assurance that receipts and expenditures are being made only in accordance with management and director authorization; and

• provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of assets that could have a material effect on the consolidated financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Management assessed the effectiveness of our internal control over financial reporting as of December 30, 2017. Management based this assessment on criteria described in *Internal Control - Integrated Framework* (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

**Based on this assessment, management determined that as of December 30, 2017, we maintained effective internal control over financial reporting.** PricewaterhouseCoopers LLP, an independent registered public accounting firm, who audited the consolidated financial statements included in this Annual Report on Form 10-K, has also audited the effectiveness of our internal control over financial reporting as of December 30, 2017, as stated in their report which appears herein under Item 8.

(Emphasis added.)

60.     On May 3, 2018, the Company filed a Form 10-Q for the quarter ended March 31, 2018 (the "1Q 2018 10-Q") with the SEC, which provided the Company's first quarter 2018 financial results and position. The 1Q 2018 10-Q contained signed SOX certifications by Hees and Defendant Knopf attesting to the accuracy of financial reporting and the disclosure of any material changes to the Company's internal controls over financial reporting.

61.     The 1Q 2018 10-Q stated that the Company had adequate internal controls and complied with SEC regulations, stating in pertinent part:

**Evaluation of Disclosure Controls and Procedures**

Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures as of the end of the period covered by this report. **Based on that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures, as of March 31, 2018, were effective and provided reasonable assurance that the information required to**

be disclosed by us in reports filed or submitted under the Securities Exchange Act of 1934 is (i) recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms, and (ii) accumulated and communicated to our management, including the Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure.

**Changes in Internal Control over Financial Reporting**

Our Chief Executive Officer and Chief Financial Officer, with other members of management, evaluated the changes in our internal control over financial reporting during the three months ended March 31, 2018. **We determined that there were no changes in our internal control over financial reporting during the three months ended March 31, 2018 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting**.

(Emphasis added.)

62. The 1Q 2018 10-Q stated that the Company was carrying $44,843 million in goodwill and $53,757 million in intangible assets, stating, in pertinent part, the following:

We test goodwill for impairment at least annually in the second quarter or when a triggering event occurs. We performed our 2017 annual impairment test as of April 2, 2017. As a result of our 2017 annual impairment test, there was no impairment of goodwill. Each of our goodwill reporting units had excess fair value over its carrying value of at least 10% as of April 2, 2017.

Our goodwill balance consists of 20 reporting units and had an aggregate carrying value of $44.8 billion as of March 31, 2018. As a majority of our goodwill was recently recorded in connection with business combinations that occurred in 2015 and 2013, representing fair values as of the respective transaction dates, there was not a significant excess of fair values over carrying values as of April 2, 2017. We have a risk of future impairment to the extent that individual reporting unit performance does not meet our projections. Additionally, if our current assumptions and estimates, including projected revenues and income growth rates, terminal growth rates, competitive and consumer trends, market-based discount rates, and other market factors, are not met, or if valuation factors outside of our control change unfavorably, the estimated fair value of our goodwill could be adversely affected, leading to a potential impairment in the future. No events occurred during the period ended March 31, 2018 that indicated it was more likely

21

than not that our goodwill was impaired. There were no accumulated impairment losses to goodwill as of March 31, 2018.

* * *

We test indefinite-lived intangible assets for impairment at least annually in the second quarter or when a triggering event occurs. We performed our 2017 annual impairment test as of April 2, 2017. As a result of our 2017 annual impairment test, we recognized a non-cash impairment loss of $49 million in SG&A in the second quarter of 2017. This loss was due to continued declines in nutritional beverages in India. The loss was recorded in our EMEA segment as the related trademark is owned by our Italian subsidiary. Each of our other brands had excess fair value over its carrying value of at least 10% as of April 2, 2017.

Our indefinite-lived intangible assets primarily consist of a large number of individual brands and had an aggregate carrying value of $53.8 billion as of March 31, 2018. As a majority of our indefinite-lived intangible assets were recently recorded in connection with business combinations that occurred in 2015 and 2013, representing fair values as of the respective transaction dates, there was not a significant excess of fair values over carrying values as of April 2, 2017. We have a risk of future impairment to the extent individual brand performance does not meet our projections. Additionally, if our current assumptions and estimates, including projected revenues and income growth rates, terminal growth rates, competitive and consumer trends, market-based discount rates, and other market factors, are not met, or if valuation factors outside of our control change unfavorably, the estimated fair values of our indefinite-lived intangible assets could be adversely affected, leading to potential impairments in the future. No events occurred during the period ended March 31, 2018 that indicated it was more likely than not that our indefinite-lived intangible assets were impaired.

63.    On August 3, 2018, the Company filed a Form 10-Q for the quarter ended June 30, 2018 (the "2Q 2018 10-Q") with the SEC, which provided the Company's second quarter 2018 financial results and position. The 2Q 2018 10-Q contained signed SOX certifications by Hees and Defendant Knopf attesting to the accuracy of financial reporting and the disclosure of any material changes to the Company's internal controls over financial reporting.

64.    The 2Q 2018 10-Q stated that the Company had adequate internal controls and complied with SEC regulations, stating in pertinent part:

**Evaluation of Disclosure Controls and Procedures**

Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures as of the end of the period covered by this report. **Based on that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures, as of June 30, 2018, were effective and provided reasonable assurance that the information required to be disclosed by us in reports filed or submitted under the Securities Exchange Act of 1934 is (i) recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms, and (ii) accumulated and communicated to our management, including the Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure.**

**Changes in Internal Control over Financial Reporting**

Our Chief Executive Officer and Chief Financial Officer, with other members of management, evaluated the changes in our internal control over financial reporting during the three months ended June 30, 2018. **We determined that there were no changes in our internal control over financial reporting during the three months ended June 30, 2018 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting**.

(Emphasis added.)

65.     The 2Q 2018 10-Q stated that its goodwill and intangible assets numbered $44,270

million and $53,379 million respectively, stating, in pertinent part, the following:

Our goodwill balance consists of 20 reporting units and had an aggregate carrying value of $44.3 billion as of June 30, 2018. We test goodwill for impairment at least annually in the second quarter or when a triggering event occurs. We performed our 2018 annual impairment test as of April 1, 2018. As a result of our 2018 annual impairment test, we recognized a non-cash impairment loss of $164 million in SG&A related to our Australia and New Zealand reporting unit. This impairment loss was primarily due to margin declines in the region. The goodwill carrying value of this reporting unit was $509 million prior to its impairment. Additionally, we noted that four of our 20 reporting units each had excess fair value over its carrying value of less than 10%. As of the impairment test date, the goodwill carrying values associated with these reporting units were $4.7 billion for

Canada Retail, $424 million for Latin America Exports, $407 million for Northeast Asia, and $326 million for Southeast Asia.

We generally utilize the discounted cash flow method under the income approach to estimate the fair value of our reporting units. Some of the more significant assumptions inherent in estimating the fair values include the estimated future annual net cash flows for each reporting unit (including net sales, cost of products sold, SG&A, working capital, and capital expenditures), income tax rates, and a discount rate that appropriately reflects the risk inherent in each future cash flow stream. We selected the assumptions used in the financial forecasts using historical data, supplemented by current and anticipated market conditions, estimated product category growth rates, management plans, and guideline companies.

Fair value determinations require considerable judgment and are sensitive to changes in underlying assumptions, estimates, and market factors. Estimating the fair value of individual reporting units requires us to make assumptions and estimates regarding our future plans, as well as industry and economic conditions. If our current assumptions and estimates, including future annual net cash flows, income tax rates, and discount rates, are not met, or if valuation factors outside of our control change unfavorably, the estimated fair value of our goodwill could be adversely affected, leading to a potential impairment in the future. Additionally, as a majority of our goodwill was recorded in connection with business combinations that occurred in 2015 and 2013, representing fair values as of the respective transaction dates, those amounts are more susceptible to an impairment risk if business operating results or macroeconomic conditions deteriorate.

Accumulated impairment losses to goodwill were $164 million at June 30, 2018. There were no accumulated impairment losses to goodwill at December 30, 2017.

* * *

Our indefinite-lived intangible assets primarily consist of a large number of individual brands and had an aggregate carrying value of $53.4 billion as of June 30, 2018. We test indefinite-lived intangible assets for impairment at least annually in the second quarter or when a triggering event occurs. We performed our 2018 annual impairment test as of April 1, 2018. As a result of our 2018 annual impairment test, we recognized a non-cash impairment loss of $101 million in SG&A in the second quarter of 2018. This impairment loss was due to net sales and margin declines related to the *Quero* brand in Brazil. Additionally, as of April 1, 2018, two brands (*ABC* and *Smart Ones*) each had excess fair value over its carrying

24

value of less than 10%. These brands had an aggregate carrying value of $665 million as of April 1, 2018.

As a result of our 2017 annual impairment testing, we recognized a noncash impairment loss of $48 million in SG&A in the second quarter of 2017. This loss was due to continued declines in nutritional beverages in India. The loss was recorded in our EMEA segment as the related trademark is owned by our Italian subsidiary.

We generally utilize the excess earnings method under the income approach to estimate the fair value of certain of our largest brands. Some of the more significant assumptions inherent in estimating the fair values include the estimated future annual net cash flows for each brand (including net sales, cost of products sold, and SG&A), contributory asset charges, income tax considerations, a discount rate that reflects the level of risk associated with the future earnings attributable to the brand, and management's intent to invest in the brand indefinitely. We selected the assumptions used in the financial forecasts using historical data, supplemented by current and anticipated market conditions, estimated product category growth rates, management plans, and guideline companies.

We generally utilize the relief from royalty method under the income approach to estimate the fair value of our remaining brands. Some of the more significant assumptions inherent in estimating the fair values include the estimated future annual net sales for each brand, royalty rates (as a percentage of revenue that would hypothetically be charged by a licensor of the brand to an unrelated licensee), income tax considerations, a discount rate that reflects the level of risk associated with the future cost savings attributable to the brand, and management's intent to invest in the brand indefinitely. We selected the assumptions used in the financial forecasts using historical data, supplemented by current and anticipated market conditions, estimated product category growth rates, management plans, and guideline companies.

Fair value determinations require considerable judgment and are sensitive to changes in underlying assumptions, estimates, and market factors. Estimating the fair value of individual indefinite-lived intangible assets requires us to make assumptions and estimates regarding our future plans, as well as industry and economic conditions. If our current assumptions and estimates, including future annual net cash flows, royalty rates, contributory asset charges, income tax considerations, and discount rates, are not met, or if valuation factors outside of our control change unfavorably, the estimated fair values of our indefinite-lived intangible assets could be adversely affected, leading to potential impairments in the future. Additionally, as a majority of our indefinite-lived intangible assets were

25

recorded in connection with business combinations that occurred in 2015 and 2013, representing fair values as of the respective transaction dates, those amounts are more susceptible to an impairment risk if business operating results or macroeconomic conditions deteriorate.

66.     On November 2, 2018, the Company filed a Form 10-Q for the quarter ended September 29, 2018 (the "3Q 2018 10-Q") with the SEC, which provided the Company's third quarter 2018 financial results and position.   The 3Q 2018 10-Q contained signed SOX certifications by Hees and Defendant Knopf attesting to the accuracy of financial reporting and the disclosure of any material changes to the Company's internal controls over financial reporting.

67.     The 3Q 2018 10-Q stated that the Company had adequate internal controls and complied with SEC regulations, stating in pertinent part:

**Evaluation of Disclosure Controls and Procedures**

Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures as of the end of the period covered by this report. **Based on that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures, as of September 29, 2018, were effective and provided reasonable assurance that the information required to be disclosed by us in reports filed or submitted under the Securities Exchange Act of 1934 is (i) recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms, and (ii) accumulated and communicated to our management, including the Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure.**

**Changes in Internal Control over Financial Reporting**

Our Chief Executive Officer and Chief Financial Officer, with other members of management, evaluated the changes in our internal control over financial reporting during the three months ended September 29, 2018. **We determined that there were no changes in our internal control over financial reporting during the three months ended September 29, 2018 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.**

(Emphasis added.)

68.     The 3Q 2018 10-Q stated that its goodwill and intangible assets numbered $44,308 million and $53,038 million respectively, stating, in pertinent part, the following:

Our goodwill balance consists of 20 reporting units and had an aggregate carrying value of $44.3 billion as of September 29, 2018. We test goodwill for impairment at least annually in the second quarter or when a triggering event occurs. We performed our 2018 annual impairment test as of April 1, 2018. As a result of our 2018 annual impairment test, we recognized a non-cash impairment loss of $164 million in SG&A related to our Australia and New Zealand reporting unit. This impairment loss was primarily due to margin declines in the region. The goodwill carrying value of this reporting unit was $509 million prior to its impairment. Additionally, five of our 20 reporting units each had excess fair value over its carrying value of less than 10%. As of the impairment test date, the goodwill carrying values associated with these reporting units were $4.7 billion for Canada Retail, $424 million for Latin America Exports, $407 million for Northeast Asia, $326 million for Southeast Asia, and $232 million for Other Latin America.

We generally utilize the discounted cash flow method under the income approach to estimate the fair value of our reporting units. Some of the more significant assumptions inherent in estimating the fair values include the estimated future annual net cash flows for each reporting unit (including net sales, cost of products sold, SG&A, working capital, and capital expenditures), income tax rates, and a discount rate that appropriately reflects the risk inherent in each future cash flow stream. We selected the assumptions used in the financial forecasts using historical data, supplemented by current and anticipated market conditions, estimated product category growth rates, management plans, and guideline companies. Fair value determinations require considerable judgment and are sensitive to changes in underlying assumptions, estimates, and market factors. Estimating the fair value of individual reporting units requires us to make assumptions and estimates regarding our future plans, as well as industry and economic conditions. If our current assumptions and estimates, including future annual net cash flows, income tax rates, and discount rates, are not met, or if valuation factors outside of our control change unfavorably, the estimated fair value of our goodwill could be adversely affected, leading to a potential impairment in the future. Additionally, as a majority of our goodwill was recorded in connection with business combinations that occurred in 2015 and 2013, representing fair values as of the respective transaction dates, those amounts are more susceptible to an impairment risk if business operating results or macroeconomic conditions

deteriorate. No events occurred during the period ended September 29, 2018 that indicated it was more likely than not that our goodwill was impaired.

Accumulated impairment losses to goodwill were $164 million at September 29, 2018. There were no accumulated impairment losses to goodwill at December 30, 2017.

\* \* \*

Our indefinite-lived intangible assets primarily consist of a large number of individual brands and had an aggregate carrying value of $53.0 billion as of September 29, 2018. We test indefinite-lived intangible assets for impairment at least annually in the second quarter or when a triggering event occurs. We performed our 2018 annual impairment test as of April 1, 2018. As a result of our 2018 annual impairment test, we recognized a non-cash impairment loss of $101 million in SG&A in the second quarter of 2018. This impairment loss was due to net sales and margin declines related to the *Quero* brand in Brazil. Additionally, as of April 1, 2018, two brands (*ABC* and *Smart Ones*) each had excess fair value over its carrying value of less than 10%. These brands had an aggregate carrying value of $665 million as of April 1, 2018.

In the third quarter of 2018, we recognized a non-cash impairment loss of $215 million in SG&A related to the *Smart Ones* brand. This impairment loss was primarily due to reduced future investment expectations and continued sales declines in the third quarter of 2018. We transferred the remaining carrying value of *Smart Ones* to definite-lived intangible assets. No events occurred during the period ended September 29, 2018 that indicated it was more likely than not that our other indefinite-lived intangible assets were impaired. As a result of our 2017 annual impairment testing, we recognized a non-cash impairment loss of $48 million in SG&A in the second quarter of 2017. This loss was due to continued declines in nutritional beverages in India. The loss was recorded in our EMEA segment as the related trademark is owned by an Italian subsidiary. We generally utilize the excess earnings method under the income approach to estimate the fair value of certain of our largest brands. Some of the more significant assumptions inherent in estimating the fair values include the estimated future annual net cash flows for each brand (including net sales, cost of products sold, and SG&A), contributory asset charges, income tax considerations, a discount rate that reflects the level of risk associated with the future earnings attributable to the brand, and management's intent to invest in the brand indefinitely. We selected the assumptions used in the financial forecasts using historical data, supplemented by current and anticipated market conditions, estimated product category growth rates, management plans, and guideline companies.

We generally utilize the relief from royalty method under the income approach to estimate the fair value of our remaining brands. Some of the more significant assumptions inherent in estimating the fair values include the estimated future annual net sales for each brand, royalty rates (as a percentage of revenue that would hypothetically be charged by a licensor of the brand to an unrelated licensee), income tax considerations, a discount rate that reflects the level of risk associated with the future cost savings attributable to the brand, and management's intent to invest in the brand indefinitely. We selected the assumptions used in the financial forecasts using historical data, supplemented by current and anticipated market conditions, estimated product category growth rates, management plans, and guideline companies.

Fair value determinations require considerable judgment and are sensitive to changes in underlying assumptions, estimates, and market factors. Estimating the fair value of individual indefinite-lived intangible assets requires us to make assumptions and estimates regarding our future plans, as well as industry and economic conditions. If our current assumptions and estimates, including future annual net cash flows, royalty rates, contributory asset charges, income tax considerations, and discount rates, are not met, or if valuation factors outside of our control change unfavorably, the estimated fair values of our indefinite-lived intangible assets could be adversely affected, leading to potential impairments in the future. Additionally, as a majority of our indefinite-lived intangible assets were recorded in connection with business combinations that occurred in 2015 and 2013, representing fair values as of the respective transaction dates, those amounts are more susceptible to an impairment risk if business operating results or macroeconomic conditions deteriorate

69.    Despite the Company's positive public statements, behind the scenes, this high-profile merger with expectations to create long term shareholder value failed to deliver. From the start in 2015, the Kraft Heinz strategy centered on debt-driven acquisitions and harsh cost-cutting to create earnings growth.

70.    However, by the beginning of the Class Period, Defendants knew – or should have known – that cost-cutting measures had damaged the Company's iconic brands and drained the Company of its resources.

71.     During the Class Period, the Company experienced significant sales declines in its legacy brands, such as Oscar Mayer and Kraft, as the tastes of a new generation of consumers switched to organic brands and small or private label alternatives.  For example, during the Class Period, Defendants knew – or should have known – that the value of the Oscar Mayer trademark was impaired due to declining sales and decreases in market shares.  Similarly, Defendants knew – or should have known – that value of the Kraft brand was likewise impaired by lagging sales and market share losses caused by lower priced and e-commerce retailers.

72.     The damage done to Kraft Heinz was only unveiled to the public when, on February 21, 2019, Kraft Heinz announced its earnings for the fourth quarter of 2018 and disclosed that the Company took an impairment charge of $15.4 billion to lower the carrying amount of goodwill in its U.S. Refrigerated and Canada Retail reporting units and the carrying amount of certain intangible assets, including the Kraft and Oscar Mayer trademarks.  The impairment charge resulted in a net loss attributable to common shareholders of $12.6 billion and diluted loss per share of $10.34.

73.     The Company further publicly disclosed, for the first time on February 21, 2019, that Kraft Heinz had received a subpoena from the SEC in October 2018 in relation to the Company's procurement function.  As a result of the SEC investigation, the Company conducted its own internal investigation, which resulted in the Company recording a $25 million increase to costs of products sold, damaging the Company's credibility and provoking fears of future accounting adjustments.

74.     On the same day, the Company announced a quarterly dividend of $0.40 per share, which represents a 36% reduction from the $0.625 quarterly dividend Kraft Heinz had been

paying. This reduction was designed to save the company $1 billion a year to help reduce long-term debt of $30.9 billion.

75.     As a result of these disclosures, the price of Kraft Heinz common stock plummeted over 27% from $48.18 per share to $34.95 per share, erasing more than $16 billion of the Company's market capitalization, thereby damaging the Plan and Plan participants invested in Kraft Heinz stock.

76.     However, Defendants knew, or should have known, that, as a result of the 2015 merger, Kraft Heinz showed an inaccurate amount of goodwill and intangible assets on its books.

77.     For example, as of December 2017, the Company showed $44.8 billion in goodwill on its balance sheet, which was 37% of the Company's total assets. Goodwill and intangible assets together represented a whopping 87% of the Company's assets. As early as May 2017, analysts were questioning the amount of goodwill and intangible assets the Company was carrying yet no one at Kraft Heinz, including Defendants, attempted to correct the Company's misleading public statements or to remedy the Company's impaired goodwill and intangible assets that had artificially inflated Kraft Heinz's stock price.

78.     Defendants breached their fiduciary duties under ERISA by allowing the Plan to continue investing in Kraft Heinz stock despite knowing that that the value of Kraft Heinz's stock was artificially inflated.

79.     Given the gravity of the disclosures made by Kraft Heinz on February 21, 2019, it is now clear that the statements referenced above artificially inflated the Company's stock price because they failed to disclose that Kraft would be forced to write down a significant amount of goodwill and certain intangible assets in its Kraft and Oscar Mayer businesses and in its U.S.

Refrigerated and Canadian retail reporting units, and that Kraft's internal controls, specifically with respect to its procurement area, were inadequate.

80.     These misstatements and Kraft Heinz's failure to disclose material information to the public caused the market to improperly value the Company's stock price.

## THE PLAN'S FIDUCIARY BREACHES:
## FIDUCIARY ACTION SHOULD HAVE BEEN TAKEN

81.     Defendants are fiduciaries who owed Plan participants the duty to monitor and ensure the prudence of the Plans investments and to communicate truthfully with those to whom their duties were owed.  Each Plan fiduciary had a continuing duty to monitor employee retirement funds in Kraft Heinz stock and to ensure that this investment remained a prudent option based on what each Plan fiduciary knew or should have known at the time.

82.     Throughout the Class Period, Defendants knew or should have known the truth about the Company's artificially inflated stock price and should have tried to cause the Company to take corrective action with regard to the impaired goodwill and intangible assets and any false or misleading statements made by the Company.  They knew or should have known that this non-public information was enormously material to the market, and that its concealment from the public would therefore cause Kraft Heinz's stock to trade at an artificially high price, making the stock an imprudent investment for Plan participants.  Yet, despite such knowledge, Defendants did nothing to protect the retirement savings of the Plan participants to whom they owed their fiduciary duties.

83.     The monitoring-fiduciary Defendants, CEO Hees and CFOs Basilio and then Knopf, were the SOX co-signatories of Kraft Heinz's SEC filings, and, therefore knew or should have known about the Company's misleading statements that artificially drove up the Company's stock price.  They were centrally involved in the preparation of the financial statements, including

32

with respect to monitoring the value of the Company's goodwill and intangible assets. As senior executives and monitoring fiduciaries, Defendants Hees, Basilio and Knopf were well-positioned to know that Kraft Heinz had inaccurately represented its financial health to the public, and thus that Kraft Heinz stock was trading at an artificially inflated value, making it an imprudent investment for Plan participants. When Defendants Hees, Basilio and Knopf saw that those members of the EBAB with senior product or accounting responsibility were failing to act on the knowledge of Kraft Heinz stock's artificial inflation and imprudence, they should have used their removal power as monitoring fiduciaries to remove those members from the EBAB and replaced them with individuals who would comply with their fiduciary duties and not allow Plan participants to be harmed by continued investment in an imprudent stock fund.

84.     Many members of the EBAB were also well-positioned to know that Kraft Heinz stock was materially overvalued and thus imprudent for Plan participants. Defendants Skinger and Garlati served as the most senior accounting officer of Kraft Heinz, and were therefore directly involved with, and responsible for, Kraft Heinz's decisions regarding how to account for the Company's various assets, including its goodwill and other intangibles. These Defendants knew or should have known that these assets were improperly and inaccurately accounted for and thus that material information regarding the true value of Kraft Heinz assets had been withheld from the public, causing Kraft Heinz to become artificially inflated and imprudent for Plan participants.

85.     Similarly, Defendants Natarajan and Xu served as senior Treasury officers with intimate knowledge of Kraft Heinz's finances and how its many assets, including its intangible assets, were valued. In light of their deep finance background and pivotal role in Kraft Heinz's financial assessment, they knew or should have known that the public was being presented with a materially incomplete picture of Kraft Heinz's value.

33

86.     The same holds true for Defendants Stoner, Liu and Guidotti, whose senior marketing, finance and operational roles and responsibilities put them in a strong position to become aware of the misstatements regarding the Company's goodwill and the value of the Kraft and Oscar Mayer brands as well as Kraft Heinz's procurement function.  As the marketing executive for sauces and condiments, Defendant Liu knew or should have known about the impairment of intangible assets involving Kraft and Oscar Mayer brands in this field.  Likewise, Defendant Guidotti's role as head of marketing for the Oscar Mayer brand put him in an ideal position to to know that the Oscar Mayer trademark was overvalued and to communicate this information to his colleagues on the EBAB.

87.     However, regardless of the precise position that the EBAB members held within the larger Kraft Heinz company, their membership on the EBAB required each of them to continuously monitor and investigate the prudence of investments in Kraft Heinz stock, to cause corrective disclosures to be made about Kraft Heinz and the value of its stock, and to communicate truthfully to Plan participants, to whom they owed the highest order of fiduciary duty.

88.     Defendants were aware that Kraft Heinz stock was a popular Plan investment, and also aware that that popular investment had become an imprudent one, evidenced by how quickly the Company's stock price plummeted once the truth became known.  Yet Defendants did nothing to protect the retirement savings of the Plan participants.

**A.  Corrective Disclosures Should Have Been Made and Could Not Have Caused "More Harm Than Good"**

89.     Defendants had the power to cause corrective public disclosures to be made through the Company's SEC filings that would have corrected the stock's artificially inflated price and ensured that Kraft Heinz stock was a prudent investment.

90.     Moreover, Defendants knew—or should have known—that disclosure of Kraft Heinz's artificially inflated stock was inevitable.  The only relevant question for Defendants should have been whether it would be better for Plan participants for the correction to occur sooner or later.  Thus, the question was not *whether* the Defendants could prevent a stock drop due to Kraft Heinz's concealment of material information, but *when* that drop would occur, and how severe it would be.  Defendants should have recognized that the sooner they acted, the less severe the drop, and, therefore, the less harm to the Plan and to the Plan participants.

91.     Defendants could have mitigated the damage done to Plan participants by causing corrective public disclosure at an earlier time.  But as time went on, more Plan participants made purchases at artificially high prices, increasing the harm to Plan participants.  As two experts framed the issue:

> If the fraud occurs on one day at the beginning of the class period so that the gap between the value line and the price line appears immediately, the bias will be small because only investors who purchased the securities in the first few days of the class period are affected by the error.  However, if the fraud consists of a series of omissions and misrepresentations so that the gap between the price line and the value line widens slowly, *the inflation will be overstated for a much larger group of purchasers*.

Bradford Cornell and R. Gregory Morgan, *Using Finance Theory to Measure Damages in Fraud on the Market Cases*, 37 UCLA L. Rev. 883, 911 (1990) (emphasis added).

92.     Defendants also needed to act to prevent *future* harm and damage to the Plan's investment in Kraft Heinz stock.  The Plan participants' investment was at risk from a large stock price correction when the public learned the truth and realized that the Company had concealed material information regarding the value of Kraft Heinz's goodwill and other intangibles.  By failing to make corrective disclosures, the Defendants put the Plan participants' investment in Kraft Heinz stock at risk for a serious and lasting decline in value, and hurt management's

credibility, and the long-term prospects of Kraft Heinz as an investment. This significant harm to the Plan could also have been prevented or mitigated by timely disclosure.

93.     The eventual disclosure of the real value of Kraft Heinz's goodwill and other intangibles was inevitable. The sheer size of the write-down that was ultimately taken – over $15 **billion** in value – cannot simply be waved away. That kind of deterioration in value, particularly given the decline in sales experienced by the business lines primarily responsible for this deterioration, should not simply go unnoticed, especially by senior marketing and finance executives like Defendants.

94.     As the Class Period went on, and the Company continued to profess the soundness of its internal controls and valuation of its intangibles, Defendants knew or should have known that these representations did not reflect reality. Then, as fiduciaries, they should have asked themselves:  is it better to do nothing or to try to correct the artificial inflation – the imprudence – of the Company's stock?

95.     Defendants should have considered whether taking no action at all was really a feasible alternative under these specific circumstances. The value of Kraft Heinz's intangibles deteriorated consistently throughout the Class Period. How would they be able to keep that deterioration a secret?  And once it came out, the Company's stock price would decline accordingly.

96.     By the beginning of the Class Period, the overvaluation of Kraft Heinz's goodwill and other intangible assets was no longer theoretical or unproven; it was a known (or at least knowable) fact. Unlike in some cases, where a prudent fiduciary might reasonably want to investigate whether an investment has, in fact, become imprudent, the time for investigation had long since passed by the time of the Class Period. Thus, Defendants should have been focused on

36

trying to prevent further harm to Plan participants investing in that imprudent asset. They should have sought to prevent further purchases of imprudent stock at inflated prices, and they should have sought an earlier disclosure to enable a softer landing for the high-flying stock. The option of doing nothing and hoping the artificial inflation would somehow go away on its own was no longer on the table.

97.     A company like Kraft Heinz can suffer real "reputational damage" from a prolonged period of artificially inflated stock that is significantly greater than any regulatory fines or other penalties that it may occur. *See* Jonathan M. Karpoff, D. Scott Lee and Gerald S. Martin, *The Cost to Firms of Cooking the Books*, Journal of Financial and Quantitative Analysis, Vol. 43, No. 3 (Sept. 2008). In fact, the reputational penalty is "7.5 times the sum of all penalties imposed through the legal and regulatory system" and "*[f]or each dollar that a firm misleadingly inflates its market value, on average, it loses this dollar when its misconduct is revealed, plus an additional $3.08 . … [of which] $2.71 is due to lost reputation*." *Id.* (emphasis added). This reputational damage increases the longer the public company's stock is artificially high. *Id.*

98.     Defendants' inaction thus led to a much harsher price correction than was necessary, one that investors, including Plan participants, are still suffering the consequences of today. Defendants should have recognized that earlier disclosure was by far the less harmful option.

99.     Defendants could not have reasonably believed that effectuating truthful, corrective disclosure would do "more harm than good" to the Plan or its participants. While the Company disclosed that it performed annual goodwill impairment testing and, on occasion, wrote down relatively modest amounts of goodwill and intangible asset carrying costs, Defendants' duty did not end with GAAP compliance. The point of performing periodic goodwill impairment testing is

to reckon with the possibility that the anticipated benefits of the 2015 merger of Kraft and Heinz may never be realized. To suggest that a fiduciary duty is satisfied by the mere acknowledgment that basic GAAP principles have been followed is to strip all substance out of the fiduciary appointment.

100. The Plan participants were also deprived of the option of transferring their shares into one of the different, prudent investment alternatives under the Plan, which would have spared them from the greater losses when the stock correction took place. And over the long term, the failures to act by the Plan fiduciaries to expose corporate fraud is likely to have a chilling effect on future purchases of Kraft Heinz stock by Plan participants, whose trust in their employer is inevitably eroded by this malfeasance. Such an effect constitutes a net harm to the Plan.

101. Additionally, the issuance of a corrective disclosure was arguably required by the federal securities laws. By the very same mechanism that Kraft Heinz could have used to make corrective disclosures to the general public under the federal securities laws, it could also have made disclosures to Plan participants, because Plan participants are, after all, part of the general public. Defendants did not have to make a "special" disclosure only to Plan participants, but could simply have caused, through personnel with disclosure responsibilities – such as Defendants Hees, Basilio and Knopf – one corrective disclosure to be made to the world and thereby simultaneously satisfied its obligations under the federal securities laws *and* ERISA.

102. And, even if Defendants determined that disclosure was not required by the securities laws, disclosure was certainly not prohibited by them. As discussed above, the truth's emergence, and thus Kraft Heinz's stock price correction, was inevitable. Thus, Defendants, in weighing harm versus good, should have concluded that even a disclosure not required by the

securities laws would, in this case, be less harmful than waiting for the disclosure to happen through some other mechanism.

103.    Millions of dollars were lost from the Plan participants' retirement accounts. Defendants are directly responsible for this enormous harm that its breaches of duty caused.

## VII.    CLASS ACTION ALLEGATIONS

104.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Procedure 23(a), (b)(l) and/or (b)(2) on behalf of themselves and the following class of persons similarly situated (the "Class"):

> All individuals, excluding defendants, who participated in the Plan and whose individual accounts purchased and/or held Kraft Heinz stock at any time between May 4, 2017, through February 21, 2019, inclusive, and who were damaged thereby.

105.    Excluded from the Class are Defendants, the officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

106.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there could be up to 21,000 members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Kraft Heinz or the Plan and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

107.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

108.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

    a.    Whether Defendants each owed a fiduciary duty to the Plan, to Plaintiffs and to members of the Class;

    b.    Whether Defendants breached fiduciary duties owed to the Plan, to Plaintiffs and to members of the Class by failing to act prudently and solely in the interests of the Plan and the Plan's participants and beneficiaries;

    c.    Whether Defendants failed to provide sufficient material disclosure to any and all Plan fiduciaries;

    d.    Whether Defendants violated ERISA; and

    e.    The extent to which Class members have sustained damages and the proper measure of those damages.

109.    Plaintiffs' claims are typical of the claims of the members of the Class because Plaintiffs and the other members of the Class each sustained damages or were negatively affected by Defendants' wrongful conduct in violation of ERISA as complained of herein.

110.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel highly competent and experienced in class action and complex litigation, including actions involving ERISA plans.  Plaintiffs have no interest antagonistic to or in conflict with those of the Class.

111.    Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because this action is also brought on behalf of the Plan, and any prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to the Plan which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

112.     Class action status is also warranted under the other subsections of Rule 23(b) because: (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; (ii) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory or other appropriate equitable relief with respect to the Class as a whole.

113.     Plaintiffs also bring this action on behalf of the Plan pursuant to ERISA §§ 409(a), 502(a)(2), 29 U.S.C. §§ 1109(a), 1132(a)(2).

**COUNT I**
**Failure to Prudently and Loyally Manage the Plan's Assets**
**(Against Defendants EBAB, Stoner, Natarajan, Xu, Liu, Guidotti, Skinger and Garlati)**

114.     Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

115.     At all relevant times, as alleged above, all Defendants were fiduciaries within the meaning of ERISA § 3(21)(a), 29 U.S.C. § 1002(21)(A) in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

116.     Under ERISA, fiduciaries who exercise discretionary authority or control over management of a plan or disposition of a plan's assets are responsible for ensuring that investment options made available to participants under a plan are prudent. Furthermore, such fiduciaries are responsible for ensuring that all investments in the Company's stock in the Plan were prudent and that such investment was consistent with the purpose of the Plan.  Defendants are liable for losses incurred as a result of such investments being imprudent.

117.     A fiduciary's duties of loyalty and prudence require it to disregard plan documents or directives that it knows or reasonably should have known would lead to an imprudent result or

41

would otherwise harm plan participants or beneficiaries. ERISA § 404(a)(l)(D), 29 U.S.C. § 1104(a)(l)(D). Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor may it allow others, including those whom they direct or who are directed by the plans, including plan trustees, to do so.

118. Defendants' duties of loyalty and prudence also obligate them to speak truthfully to participants, not to mislead them regarding the Plan or its assets, and to disclose information that Plan participants need in order to exercise their rights and interests under the Plan. This duty to inform participants includes an obligation to provide participants and beneficiaries of the Plan with complete and accurate information, and to refrain from providing inaccurate or misleading information, or concealing material information, regarding the Plan's investments and investment options such that the Plan participants can make informed decisions with regard to the prudence of investing in such options made under the Plan.

119. Defendants breached their duties to prudently and loyally manage the Plan's assets. During the Class Period, Defendants knew or should have known that Kraft Heinz stock had become an imprudent investment for Plan participants' retirement savings because there was false and misleading material information given to Plan participants and the public about the stock that artificially inflated its value.

120. Accordingly, Defendants should have taken appropriate responsive action by trying to effectuate, through personnel with disclosure responsibilities, corrective public disclosures to cure the artificial inflation, correct the stock price, and render Kraft Heinz stock a prudent investment again. As such, between May 4, 2017, through February 21, 2019, Plan participants

could not appreciate the true risks presented by investments in Kraft Heinz's stock and, therefore, could not make informed decisions regarding their investments.

121.     As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiffs and other Plan participants and the other members of the Class, suffered foreseeable damage to or lost a significant portion of their retirement investments. Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties.

## COUNT II
### Failure to Monitor
### (Against Defendants Hees, Basilio and Knopf)

122.     Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

123.     At all relevant times, as alleged above, Defendants Hees, Basilio and Knopf were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

124.     At all relevant times, as alleged above, the scope of the fiduciary responsibility of Defendants Hees, Basilio and Knopf included the responsibility to appoint, evaluate, and monitor other Plan fiduciaries, including, but not limited to, any person or persons to whom certain fiduciary responsibilities were at least partially delegated.

125.     These Defendants' fiduciary duties entailed ensuring that these other Plan fiduciaries each had truthful and accurate information to fulfill their respective jobs and duties as fiduciaries and to properly monitor, evaluate and oversee the Plan's investment in Kraft Heinz stock.

126.     Under ERISA, a monitoring and appointing fiduciary must ensure that those fiduciaries whom he is obligated to monitor are complying with their fiduciary duties.  If a monitoring and appointing fiduciary learns that one of the fiduciaries he is overseeing is breaching a fiduciary duty, the monitoring and appointing fiduciary must take action permitted him under the Plan and ERISA to prevent this breach of fiduciary duty from continuing unchecked.

127.     Here, Defendants Hees, Basilio and Knopf had the power under the Plan to remove members of the EBAB who breached their fiduciary duties.  Thus, when Defendants Hees, Basilio and Knopf became aware that members of the EBAB were allowing Plan participants to be harmed by the continued investment of their retirement funds in an imprudent, artificially inflated ESOP, Defendants Hees, Basilio and Knopf should have used their removal powers to remove those individuals from the EBAB.  Their failure to do so directly and proximately caused the Plan, and indirectly Plaintiffs and other Plan participants, foreseeable damage to and/or losses of a significant portion of their retirement investments.

128.     Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants Hees, Basilio and Knopf are liable to restore the losses to the Plan caused by their breach of fiduciary duty.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for:

A.     Determination that the instant action may be maintained as a class action under Rule 23, Federal Rules of Civil Procedure, appointing Plaintiffs as class representatives, and determining that Plaintiffs' counsel satisfies the prerequisites of Rule 23(g);

B.     Declaration that Defendants breached ERISA fiduciary duties owed to the Plan and its participants;

C.     An Order compelling Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, to restore to the Plan all profits Defendants made through use of the Plan's assets, and to restore to the Plan all profits that the participants would have made if Defendants had fulfilled their fiduciary obligations;

D.     Imposition of a Constructive Trust on any amounts by which Defendants were unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

E.     An Order enjoining Defendants from any further violations of their ERISA fiduciary obligations;

F.     Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses including the lost opportunity costs;

G.     An Order that Defendants allocate the Plan's recovery to the accounts of all participants who had any portion of their account balances invested in Kraft Heinz stock in proportion to the accounts' losses attributable to the decline in the price of its stock or the value of investment in alternative options under the Plan.

H.     Awarding the Plan or Plan participants rescission or money damages including pre-judgment interest;

I.     An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

J.     An Order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

K.     An Order for equitable restitution and other appropriate equitable monetary relief against defendants.

L.     Such other and further relief the Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiffs and the Class request a jury trial for any and all Counts for which a trial by jury is permitted by law.

Dated: June 28, 2019                    By: */s/ Jason Archinaco___ _____*
                                            Jason Archinaco

                                        **THE ARCHINACO FIRM**
                                        Jason Archinaco
                                        1100 Liberty Avenue
                                        Suite C-6
                                        Pittsburgh, PA 15222
                                        Telephone:     (412) 434-0555
                                        Facsimile:     (888) 563-7549
                                        Email:         jarchinaco@archlawgroup.com

                                        **ZAMANSKY LLC**
                                        Samuel E. Bonderoff (admitted *pro hac vice*)
                                        Jacob H. Zamansky (admitted *pro hac vice*)
                                        James Ostaszewski (admitted *pro hac vice*)
                                        50 Broadway, 32nd Floor
                                        New York, NY 10004
                                        Telephone:     (212) 742-1414
                                        Facsimile:     (212) 742-1177
                                        Email:         samuel@zamansky.com

                                        **SCHNEIDER WALLACE**
                                        **COTTRELL KONECKY WOTKYNS LLP**
                                        Todd M. Schneider*
                                        Kyle G. Bates*
                                        James A. Bloom*
                                        2000 Powell Street, Suite 1400
                                        Emeryville, CA 94608
                                        Telephone:     (415) 421-7100
                                        Facsimile:     (415) 421-7105
                                        tschneider@schneiderwallace.com
                                        kbates@schneiderwallace.com
                                        jbloom@schneiderwallace.com

                                        **Pro Hac Vice* application forthcoming

                                        *COUNSEL FOR PLAINTIFFS AND
                                        THE PUTATIVE CLASS*

46